276 N.J. Super. 163 (1994)
647 A.2d 852
GLENFED FINANCIAL CORPORATION, COMMERCIAL FINANCE DIVISION, A CALIFORNIA CORPORATION, PLAINTIFF-APPELLANT, CROSS-RESPONDENT,
v.
PENICK CORPORATION, A DELAWARE CORPORATION, MAYFAIR PHARMACEUTICAL, INC. AND MAYFAIR CHEMICAL, INC., DELAWARE CORPORATIONS, ARIS P. CHRISTODOULOU AND MARILENA CHRISTODOULOU, DEFENDANTS-RESPONDENTS, CROSS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued May 17, 1994.
Decided August 23, 1994.
*168 Before Judges SKILLMAN, KESTIN and WEFING.
*169 Sheldon Eisenberg argued the cause for appellant-cross-respondent (Irell and Manella, admitted pro hac vice, attorneys; Ravin, Sarasohn, Cook, Baumgarten, Fisch & Baime, attorneys; Mitchell B. Seidman and Mr. Eisenberg, on the brief).
David M. Olasov, admitted pro hac vice, argued the cause for respondents-cross-appellants (Edwards & Angell, attorneys; Alfred R. Paliani, on the brief).
The opinion of the court was delivered by SKILLMAN, J.A.D.
In early 1988, defendants Aris and Marilena Christodoulou, through their wholly-owned holding company, defendant Mayfair Pharmaceutical, Inc., purchased defendant Penick Corporation (Penick), which was a pharmaceutical company primarily engaged in the manufacture of bulk pharmaceuticals, particularly opium derivatives, for other companies, as well as the fermentation of pharmaceuticals and the manufacture of bismuth salts. To finance this acquisition, Penick borrowed $5 million from plaintiff Glenfed Financial Corporation (Glenfed) under a five-year term note. Penick also obtained a revolving line of credit from Glenfed, which was governed by a formula under which Penick could borrow up to 85% of its eligible accounts receivable, 50% of its inventory and 25% of its work in progress, subject to a maximum of $4 million. As security for these loans, Glenfed took a first lien on all of Penick's assets and also required Penick to place all payments from its customers in a "blocked account" to be held in trust for Glenfed.
Shortly after it was acquired by the Christodoulous, Penick began experiencing substantial financial losses, due primarily to sharp increases in the prices of its raw materials and intense price competition in the markets for its primary products. Consequently, Penick attempted through a series of proposed transactions to obtain additional financing from sources other than Glenfed. First, Penick attempted to borrow $2.5 million from another financial institution, Atlantic Bank (Atlantic), but this proposed *170 loan was made contingent on Glenfed's agreeing to share its security interest in Penick's assets with Atlantic. When Glenfed refused to consent to any dilution of its security interest, Atlantic declined to proceed with the loan. Second, Penick proposed to sell its primary business, the manufacture of opium derivatives, to one of its principal competitors, Mallinckrodt Special Chemical Company (Mallinckrodt). This proposal would have involved the transfer to Mallinckrodt of equipment and inventory in which Glenfed held a security interest, with Penick continuing to be indebted to Glenfed for approximately $1 million. Mallinckrodt set a short deadline for Penick to decide whether to enter into this transaction. Glenfed failed to decide whether to consent to the release of its collateral by that deadline, and consequently the transaction was not consummated. Third, Penick attempted to obtain additional financing through an Initial Public Offering (IPO) of its stock. In connection with this proposal, Penick requested Glenfed to waive Penick's violations of certain financial covenants and not to accelerate the maturity date of its loans, because the Securities and Exchange Commission would approve the IPO only if Penick's obligation to Glenfed matured at least twelve months after the IPO offering date. However, Glenfed insisted that the due date on its note be accelerated to a date no later than April 2, 1992, thus allegedly preventing the IPO from being approved.
After Penick was unsuccessful in its various efforts to obtain additional financing, it began diverting payments received from its customers, which under the loan agreement were supposed to be placed in the blocked account for the benefit of Glenfed, into its regular operating accounts. These diversions eventually totaled $866,173.53.
When Glenfed became aware of Penick's diversions of customer payments, it declared the loan in default, accelerated Penick's obligations thereunder, and initiated this litigation to collect the outstanding balance. Glenfed joined Aris and Marilena Christodoulou as defendants, alleging that their involvement in the diversion *171 of payments from Glenfed's customers constituted a conversion and an interference with its contractual rights.
Penick filed a counterclaim, alleging that Glenfed's failure to cooperate in Penick's various attempts to secure additional financing constituted a breach of Glenfed's implied duty of good faith and fair dealing. Penick also alleged that Glenfed had applied economic duress in securing Penick's agreement to the acceleration of the due date of the note from May 2, 1993 to April 2, 1992. In addition, Penick alleged that Glenfed had breached the revolving credit agreement by failing to advance additional funds in accordance with its terms.
The case was tried in the Chancery Division over a period of thirteen days. The trial court concluded that Penick had breached its obligations under the revolving credit agreement by diverting payments from its customers from the blocked account into its operating accounts, and that Penick owed Glenfed $4,440,172.83 under the credit agreement. The court also concluded that Glenfed had not breached its duty of good faith and fair dealing with respect to its involvement in Penick's efforts to secure additional financing either through the proposed loan of an additional $2.5 million from Atlantic or the sale of its bulk narcotics business to Mallinckrodt. However, the court concluded that Glenfed had exerted economic duress to secure Penick's consent to the acceleration of the maturity date of the note, and as a result Penick had suffered $3 million in damages. The court set-off these damages against the $4,440,172.83 which Penick owed Glenfed and entered judgment in favor of Glenfed for $1,440,172.83. The trial court also dismissed Glenfed's claims against the Christodoulous and declined to award Glenfed any counsel fees.
Glenfed appeals from those parts of the judgment which awarded Penick $3 million on its counterclaim and which dismissed Glenfed's claims against the Christodoulous, and also from the court's failure to award counsel fees. Penick cross-appeals from the part of the judgment which reflects the trial court's rejection of its counterclaim based on Glenfed's alleged breach of its duty of *172 good faith and fair dealing in connection with the proposed sale to Mallinckrodt. Penick also cross-appeals from the trial court's failure to award the full amount of damages which it sought on its counterclaim and from the court's failure to award prejudgment interest. Penick does not appeal from the trial court's rejection of its claims that Glenfed breached the revolving credit agreement by improperly limiting advances for working capital and that Glenfed breached its duty of good faith and fair dealing by refusing to share its security interest in Penick's assets with Atlantic.
We conclude that the trial court erred in determining that Glenfed exerted improper economic duress upon Penick in connection with the acceleration of the maturity date of its debt, and that there is no alternative basis for the imposition of liability upon Glenfed in connection with either Penick's proposed sale to Mallinckrodt or its proposed IPO. Therefore, we reverse the $3 million judgment entered in favor of Penick on its counterclaim. We also conclude that the Christodoulous are personally liable to Glenfed for the conversion of $866,173.53 in payments received from Penick's customers and that Glenfed is entitled to counsel fees in accordance with the terms of the loan agreement. Since the trial court should have dismissed Penick's counterclaims, we have no need to consider Penick's other arguments and we affirm the parts of the judgment challenged by Penick on its cross-appeal.

I
Our courts recognize that an otherwise enforceable contract may be invalidated on the ground that it was entered into under "economic duress." Continental Bank of Pa. v. Barclay Riding Academy, Inc., 93 N.J. 153, 175, 459 A.2d 1163, cert. denied, 464 U.S. 994, 104 S.Ct. 488, 78 L.Ed.2d 684 (1983). Although "there is still not firm agreement as to the scope of the concept of `economic duress,'" ibid., "the `decisive factor' is the wrongfulness of the pressure exerted." Id. at 177, 459 A.2d 1163. "The term `wrongful' in this context encompasses more than *173 criminal or tortious acts, for conduct may be legal but still oppressive." Ibid. (citation omitted); cf. 805 Third Ave. Co. v. M.W. Realty Assocs., 58 N.Y.2d 447, 461 N.Y.S.2d 778, 781, 448 N.E.2d 445, 448 (1983) ("[A] party cannot be guilty of economic duress for refusing to do that which it is not legally required to do."). However, "[w]here there is adequacy of consideration, there is generally no duress.... Merely taking advantage of another's financial difficulty is not duress." Continental Bank of Pa. v. Barclay Riding Academy, Inc., supra, 93 N.J. at 177, 459 A.2d 1163 (quoting 13 Williston on Contracts  1617 at 708 (Jaeger, 3d ed. 1970)).
Before applying these principles to this case, we address two preliminary points. First, Glenfed argues that Penick contractually waived its right to assert any counterclaims. We reject this argument substantially for the reasons expressed in section I of the trial court's written opinion. Glenfed also argues, citing National Amusements, Inc. v. New Jersey Turnpike Auth., 261 N.J. Super. 468, 479, 619 A.2d 262 (Law Div. 1992), that the concept of economic duress does not support an affirmative claim for consequential damages. See Restatement (Second) of Contracts  174-177 introductory note at 474 (1981) ("Since duress and undue influence ... are not generally of themselves actionable torts, the victim of duress or undue influence is usually limited to avoidance and does not have an affirmative action for damages."). However, it is unnecessary for us to address this argument, because Penick failed in any event to present evidence which would support a finding of economic duress.
The facts pertinent to Penick's economic duress claim may be briefly summarized. Penick covenanted in its revolving credit agreement with Glenfed to maintain working capital of at least $3 million and a net worth of at least $1.5 million as of the end of its 1990 fiscal year. Penick also agreed that its failure to abide by either of these covenants would constitute a default, which would permit Glenfed to accelerate Penick's obligation to repay the loan. It is undisputed that Penick suffered substantial financial losses *174 after entering into the revolving credit agreement and as a result it was in violation of both of these covenants as of June of 1991. Consequently, Glenfed was entitled as of that time to declare the loan in default and to accelerate Penick's obligation to make repayment. However, to facilitate its proposed IPO, Penick asked Glenfed to forbear from exercising these contractual rights and instead to advance the maturity date of the loan from May 2, 1993 to September 30, 1992. Glenfed declined this request, but rather than declaring the loan due immediately, it only agreed to advance the maturity date from May 2, 1993 to April 2, 1992.
The trial court erred in concluding that Penick's agreement to this modification of the parties' contractual rights resulted from improper economic duress. There is of course an element of compulsion anytime a creditor asks a debtor in default to agree to anything; the creditor holds the upper hand. However, that does not mean that Penick's agreement to Glenfed's demand constituted actionable economic duress. A creditor's exercise of its right to declare a loan in default or to forbear from taking such action only upon a debtor agreeing to certain modifications in the agreement is not "wrongful conduct" and therefore does not constitute economic duress. See Continental Bank of Pa. v. Barclay Riding Academy, Inc., supra.

II
Penick argues that Glenfed breached an implied duty of good faith and fair dealing by accelerating the maturity date of Penick's note to April 2, 1992 rather than to September 30, 1992, asserting that "Glenfed was obligated to provide adequate time to enable Penick to consummate the IPO." Glenfed correctly notes that the trial court did not rest its decision on this basis. Nevertheless, since Penick presented this argument to the trial court, it may raise the argument again on appeal as an alternative ground for affirmance of the judgment on its counterclaim. See Chimes v. Oritani Motor Hotel, Inc., 195 N.J. Super. 435, 443, 480 A.2d 218 (App.Div. 1984).
*175 Our courts have long recognized that there is an implied covenant of good faith and fair dealing in every contract. See, e.g., Onderdonk v. Presbyterian Homes of N.J., 85 N.J. 171, 182, 425 A.2d 1057 (1981); Palisades Properties, Inc. v. Brunetti, 44 N.J. 117, 130, 207 A.2d 522 (1965). Similarly, the Uniform Commercial Code (UCC) provides that "[e]very contract or duty [falling thereunder] imposes an obligation of good faith in its performance or enforcement." N.J.S.A. 12A:1-203. The UCC defines "good faith" as "honesty in fact in the conduct or transaction concerned." N.J.S.A. 12A:1-201(19).
However, this duty of fair dealing does not "alter the terms of a written agreement." Rudbart v. North Jersey Dist. Water Supply Comm'n, 127 N.J. 344, 366, 605 A.2d 681, cert. denied, ___ U.S. ___, 113 S.Ct. 203, 121 L.Ed.2d 145 (1992). Consequently, it may not be invoked by a commercial debtor to preclude a creditor from exercising its bargained-for rights under a loan agreement. See Hall v. Resolution Trust Corp., 958 F.2d 75, 79 (5th Cir.1992) ("[A]n `agreement made by the parties and embodied in the contract itself cannot be varied by an implicit covenant of good faith and fair dealing.'") (quoting Exxon Corp. v. Atlantic Richfield Co., 678 S.W.2d 944, 947 (Tex. 1984)); Terry A. Lambert Plumbing, Inc. v. Western Sec. Bank, 934 F.2d 976, 983 (8th Cir.1991) ("Acting according to express terms of a contract is not a breach of good faith and fair dealing."); Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting, 908 F.2d 1351, 1357 (7th Cir.1990) ("Any attempt to add an overlay of `just cause' ... to the exercise of contractual privileges [based on the UCC's requirement of `honesty in fact'] would reduce commercial certainty and breed costly litigation."); Price v. Wells Fargo Bank, 213 Cal. App.3d 465, 261 Cal. Rptr. 735, 742 (1989) (The duty of good faith and fair dealing "does not impose any affirmative duty of moderation in the enforcement of legal rights."); accord Fasolino Foods Co. v. Banca Nazionale Del Lavoro, 961 F.2d 1052, 1056-58 (2nd Cir.1992); Government St. Lumber Co. v. AmSouth Bank, N.A., 553 So.2d 68, 72-73 (Ala. 1989); Creeger Brick & Bldg. Supply, *176 Inc. v. Mid-State Bank & Trust Co., 385 Pa.Super. 30, 560 A.2d 151, 154 (1989); Badgett v. Security State Bank, 116 Wash.2d 563, 807 P.2d 356, 360 (1991).
In Badgett, the court rejected an argument that a bank's duty of good faith obligated it to consent to a restructuring of its debtor's loan so that the debtor could take advantage of a federal program which may have afforded the debtor financial salvation:
There is in every contract an implied duty of good faith and fair dealing. This duty obligates the parties to cooperate with each other so that each may obtain the full benefit of performance. However, the duty of good faith does not extend to obligate a party to accept a material change in the terms of its contract....
By urging this court to find that the Bank had a good faith duty to affirmatively cooperate in their efforts to restructure the loan agreement, in effect the [debtors] ask us to expand the existing duty of good faith to create obligations on the parties in addition to those contained in the contract ÔÇö a free-floating duty of good faith unattached to the underlying legal document. This we will not do. The duty to cooperate exists only in relation to performance of a specific contract term. As a matter of law, there cannot be a breach of the duty of good faith when a party simply stands on its rights to require performance of a contract according to its terms.
[807 P.2d at 360 (citations omitted).]
Similarly, in Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting, supra, the court rejected an argument that a bank had violated its duty of good faith by terminating its debtor's line of credit on short notice:
[T]he obligation of good faith that exists in every contractual relation ... is not an invitation to the court to decide whether one party ought to have exercised privileges expressly reserved in the document. "Good faith" is a compact reference to an implied undertaking not to take opportunistic advantage in a way that could not have been contemplated at the time of drafting, and which therefore was not resolved explicitly by the parties. When the contract is silent, principles of good faith... fill the gap. They do not block [the] use of terms that actually appear in the contract.
....
Debtor stresses ... that Bank would have been secure in making additional advances. Perhaps so, but the contract did not oblige Bank to make all advances for which it could be assured of payment. Ex post assessments of a lender's security are no basis on which to deny it the negotiated place in the queue. Risk must be assessed ex ante by lenders, rather than ex post by judges.
[908 F.2d at 1357-58 (citations omitted).]
*177 Penick relies upon various sections of the UCC which impose a duty of commercial reasonableness upon creditors with respect to certain specified activities. Specifically, N.J.S.A. 12A:9-207(1) provides that "[a] secured party must use reasonable care in the custody and preservation of collateral in his possession"; N.J.S.A. 12A:9-502(2) provides that "[a] secured party who by agreement is entitled to charge back uncollected collateral ... and who undertakes to collect from the account debtors or obligors must proceed in a commercially reasonable manner"; and N.J.S.A. 12A:9-504(3) provides that the sale or other disposition of collateral held by a secured party must be "commercially reasonable." However, Glenfed's refusal to waive Penick's default and to extend the accelerated maturity date of its obligations for more than a year clearly did not fall within any of these UCC provisions which govern with the handling and disposition of collateral. Therefore, Glenfed's actions were governed solely by the general duty of "good faith" set forth in N.J.S.A. 12A:1-203, which only required Glenfed to act with "honesty in fact" in its dealings with Penick. N.J.S.A. 12A:1-201(19); see Renaissance Yacht Co. v. Stenbeck, 818 F. Supp. 407, 411-12 (D.Me. 1993); Government St. Lumber Co. v. AmSouth Bank, N.A., supra, 553 So.2d at 72-73; Rigby Corp. v. Boatmen's Bank & Trust Co., 713 S.W.2d 517, 533-35 (Mo. Ct. App. 1986); J.R. Hale Contracting Co. v. United N.M. Bank at Albuquerque, 110 N.M. 712, 722, 799 P.2d 581, 591 (1990); United States Nat'l Bank of Or. v. Boge, 311 Or. 550, 814 P.2d 1082, 1085-91 (1991).
Penick argues that because it had been in default of the net worth and working capital covenants of the loan agreement for a substantial period of time before June 1991, Glenfed was estopped from refusing to waive its right to accelerate the maturity date of the loan for the additional fifteen-month period required for Penick's proposed IPO to be viable. However, a creditor's temporary forbearance in exercising its remedies upon its debtor's default does not preclude the creditor from subsequently exercising those rights. "Indeed, a contrary view would discourage *178 lenders from allowing borrowers leeway and encourage those lenders to play hardball in the face of every default, no matter how minor." Fasolino Foods Co. v. Banca Nazionale Del Lavoro, supra, 961 F.2d at 1057; accord Monarch Coaches, Inc. v. ITT Indust. Credit, 818 F.2d 11, 13 (7th Cir.1987). In fact, the loan agreement expressly preserved Glenfed's right to determine whether, and when, to exercise its remedies for a default:
Lender shall have the right, in its sole discretion, to determine which rights and remedies, and in which order any of the same, are to be exercised.... No act, failure or delay by Lender shall constitute a waiver of any of its rights and remedies.
Moreover, even assuming that a creditor has a duty to provide reasonable notice of its intent to accelerate upon the occurrence of a default, cf. Reid v. Key Bank of S. Me., Inc., 821 F.2d 9, 15-16 (1st Cir.1987); K.M.C. Co. v. Irving Trust Co., 757 F.2d 752, 761 (6th Cir.1985), Glenfed satisfied this duty by agreeing in June of 1991 to a modification of the loan agreement which fixed a maturity date for Penick's repayment obligation more than nine months later on April 2, 1992.
The record contains no evidence that Glenfed's refusal to grant Penick a more extended maturity date for the repayment of its debt was characterized by bad faith, that is, a lack of "honesty in fact." There is no suggestion that Glenfed was acting out of personal malice towards Penick or its principals, or that it was pursuing its own economic interests unrelated to obtaining the repayment of the loan from Penick. Although Glenfed was then in the process of withdrawing from the form of financing represented by its loan to Penick, there is no evidence that this was the reason Glenfed refused to set the maturity date of Penick's loan for September of 1992. Moreover, even if Glenfed's refusal to exercise greater forbearance had been influenced by this management policy, this would not constitute a lack of good faith because the loan agreement imposed no obligation upon Glenfed to grant a waiver of Penick's defaults under any circumstances. A creditor's duty to act in good faith does not extend to foregoing its right to accelerate upon default or otherwise compromising its contractual *179 rights in order to aid its debtor. Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting, supra, 908 F.2d at 1356-58.
In any event, even if Glenfed were subject to a duty to act in a commercially reasonable manner in considering Penick's request for a waiver of its defaults, the record would not support a finding that Glenfed violated such a duty. Penick did not merely seek a short respite from Glenfed exercising its rights under the loan agreement in order to afford Penick an opportunity to obtain alternative financing, but it instead requested Glenfed to forbear from acting on its defaults for a full fifteen months. Penick obviously could have suffered substantial additional deterioration in its financial condition during this time, thereby further jeopardizing Glenfed's opportunity to obtain repayment of the loan without recourse to litigation or other creditors' remedies. Moreover, even if Penick had succeeded in the issuance of its proposed IPO, this would not have guaranteed the repayment of its obligation to Glenfed, because the proceeds of the IPO could not have been used for this purpose; at best, the IPO simply would have improved Penick's chances of obtaining another loan which could have then been used to repay Glenfed. Therefore, even if Glenfed had been obligated to act in a commercially reasonable manner in the event of a default by Penick, it could not have been expected to stay its hand in seeking repayment of the loan for fifteen months.

III
On its cross-appeal, Penick argues that the trial court erred in rejecting its claim that Glenfed unreasonably refused to consent to the sale of its bulk narcotics business to Mallinckrodt. The predicate for this argument, like Penick's argument discussed in the preceding section of this opinion, is that Glenfed had a duty to act in a commercially reasonable manner in deciding whether to consent to Penick's proposed sale to Mallinckrodt. However, since this proposed transaction involved Penick's sale of its own property, as distinguished from a creditor's sale or other disposition *180 of secured property, it was not subject to the requirement imposed by N.J.S.A. 12A:9-504(3) that a creditor act in a commercially reasonable manner. Therefore, the conclusion reached in section II of this opinion, that the only limitation upon Glenfed's exercise of its rights under the loan agreement is the duty of good faith imposed by N.J.S.A. 12A:1-203, is equally applicable to this claim. Since there is no basis in this record to support a finding that Glenfed's failure to consent to the sale to Mallinckrodt was characterized by a lack of "honesty in fact," the trial court correctly dismissed Penick's counterclaim arising out of that proposed transaction.
In any event, even if Glenfed was required to act in a commercially reasonable manner in deciding whether to consent to Penick's proposed sale of its bulk narcotics business to Mallinckrodt, there is ample evidence in the record to support the trial court's findings that Glenfed actively encouraged the sale of Penick's bulk narcotics business to Mallinckrodt, but that it justifiably withheld consenting to the release of its collateral prior to the short deadline set by Mallinckrodt because Penick failed to make "full disclosure of the parameters of the sale." Since Penick's proposal to sell its bulk narcotics business would have substantially altered its operations and dramatically changed the nature of the company which Glenfed had financed, Glenfed certainly had reason to proceed with caution in dealing with this proposed change in its debtor. The trial court properly concluded that Penick failed to provide all the information required to satisfy Glenfed's concerns regarding the proposed sale, and that "[b]y the time Penick had provided all the necessary data to Glenfed, the possibility of a sale was lost."

IV
Glenfed, in addition to seeking recovery from Penick of the amount of its outstanding indebtedness, also made claims against Aris and Marilena Christodoulou for conversion and interference with contractual relations, based upon their roles in diverting *181 payments from Penick's customers from the blocked account established for Glenfed's benefit into Penick's regular operating accounts. In its written opinion, the trial court found that "Penick received payments from eight customers between August 20, 1991 and November 21, 1991, which it deposited into its own operating bank account instead of the Glenfed blocked account." The court also found that as a result of these actions "$866,173.53 was ... diverted for Penick's benefit." Although the trial court's opinion contains no discussion of Glenfed's claims against the Christodoulous, the judgment dismissed those claims. The parties appear to agree that the implicit basis for these dismissals was the court's view that the breach of the duty of good faith and fair dealing which Glenfed was found to have committed permitted Penick and the Christodoulous to consider themselves discharged from any further performance of their obligations under the loan agreement. See Frank Stamato & Co. v. Borough of Lodi, 4 N.J. 14, 21, 71 A.2d 336 (1950). However, even if this rationale could have justified the trial court's dismissal of Glenfed's claims against the Christodoulous, we have concluded that Glenfed did not in fact breach any duty of good faith and fair dealing which it owed to Penick. Therefore, this underpinning for the dismissal of Glenfed's claims against the Christodoulous has now been destroyed. Moreover, the Christodoulous have not suggested any other defense to these claims.
"It is well settled ... that the officers of a corporation are personally liable to one whose money or property has been misappropriated or converted by them to the uses of the corporation, although they derived no personal benefit therefrom and acted merely as agents of the corporation." Hirsch v. Phily, 4 N.J. 408, 416, 73 A.2d 173 (1950); accord McGlynn v. Schultz, 95 N.J. Super. 412, 416, 231 A.2d 386 (App.Div.), certif. denied, 50 N.J. 409, 235 A.2d 901 (1967). Penick unquestionably converted Glenfed's property by diverting payments from customers which it had agreed to place in a blocked account for Glenfed's benefit into Penick's operating accounts. Aris Christodoulou was not only *182 Penick's President and Chief Operating Officer, but there was also testimony, which Mr. Christodoulou did not dispute, that he expressly authorized the diversion of these payments, thereby making him personally liable. Marilena Christodoulou was the Executive Vice President and Chief Financial Officer of Penick, in which capacity she worked directly with her husband in the management of the corporation and supervised its financial department. This central role in corporate management is sufficient to support an inference that Mrs. Christodoulou participated, or at least acquiesced, in the diversion. Moreover, she did not deny her involvement in the diversion at trial, nor does she argue on appeal that the evidence is insufficient to support the imposition of personal liability upon her. Therefore, we conclude that the Christodoulous are personally liable to Glenfed for the conversion of $866,173.53 in payments from Penick's customers.

V
The loan agreement obligated Penick to reimburse Glenfed "for all costs of collection incurred ... after the occurrence of any event of default ... including outside attorneys' fees." Our courts recognize the enforceability of such contractual agreements for the payment of attorneys' fees incurred in a collection action. Alcoa Edgewater No. 1 Fed. Credit Union v. Carroll, 44 N.J. 442, 444-49, 210 A.2d 68 (1965). Nevertheless, the trial court did not award counsel fees to Glenfed, apparently because it concluded that Glenfed had breached its duty of good faith and fair dealing by not acceding to Penick's request for a waiver of defaults. Since we have now concluded that Glenfed did not breach its duty of good faith, and Penick does not suggest any alternative basis for refusing to award Glenfed attorneys' fees in accordance with the terms of the loan agreement, the case must be remanded to the trial court to make such an award.
Accordingly, we reverse the part of the final judgment which reflects a $3 million set-off in favor of Penick and remand for entry of an amended judgment which adds that amount to the *183 judgment in favor of Glenfed. We also reverse the part of the judgment which dismisses Glenfed's claims against the Christodoulous and remand for entry of a judgment on these claims in the amount of $866,173.53 plus interest. In addition, we reverse the part of the judgment which fails to make an award of counsel fees to Glenfed and remand to the trial court for this purpose. Those parts of the judgment challenged by Penick on its cross-appeal are affirmed.