**WINDSOR CARD SHOPS, INC., David Ricci, Paul Ricci, Margaret Ricci and Carol Ricci, Plaintiffs,**

v.

**HALLMARK CARDS, INC., and Hallmark Marketing Corporation, Defendants.**

Civil Action No. 96–5424 (JEI).

United States District Court, D. New Jersey.

Feb. 20, 1997.

563

Tomar, Simonoff, Adourian, O'Brien, Kaplan, Jacoby & Graziano by Josiah A. Knapp, Justin T. Loughry, Haddonfield, NJ, for Plaintiffs.

**564**

Patterson, Belknap, Webb & Tyler, L.L.P. by Thomas C. Morrison, New York City, Herrick, Feinstein by Ronald J. Levine (Not Appearing), Princeton, NJ, for Defendants.

## OPINION

IRENAS, District Judge:

This matter arises out of a dispute over a debt owed by the plaintiff, Windsor Card Shops ("Windsor"), to defendants Hallmark Cards, Inc. and Hallmark Marketing Corporation (collectively "Hallmark"), who supplied Hallmark products to Windsor for sale in Windsor's stores. Plaintiffs claim that they are unable to pay the debt because Hallmark, allegedly in breach of contract, opened additional retail card stores in Windsor's geographic area, thereby causing a decrease in plaintiffs' sales. Defendant has filed the instant motion, seeking to dismiss plaintiffs' complaint on two grounds: (1) failure to comply with the applicable statute of limitations, and (2) failure to state a claim upon which relief can be granted. Because we find that eight out of the nine counts in plaintiffs' complaint are barred by the statute of limitations and the remaining count fails to state a claim upon which relief can be granted, we will grant defendant's motion and dismiss the complaint in its entirety. Plaintiffs have filed a cross-motion to amend their complaint, which will be denied.

## I. FACTS

### A. Background of the Hallmark–Windsor Relationship

In 1968, Hallmark began supplying Windsor with greeting cards and related merchandise for sale in Windsor card stores. Windsor avers that it purchased over $2 million worth of merchandise each year. During the

course of their relationship, Hallmark extended credit to Windsor for the purchase of the merchandise. The Hallmark–Retailer relationship is not one of exclusivity.[1] See Statement of the Hallmark Market Development Policy, Callicott Aff.Ex. A. Hallmark and Windsor did not enter into a trademark licensing agreement. Thus, Windsor sold Hallmark products but operated its stores under its own name.

In 1987 and 1988, Hallmark authorized the opening of additional card stores in the vicinity of the Windsor stores. Following the openings, David Ricci ("Ricci"), president of Windsor, wrote to Hallmark on more than one occasion to complain about the new stores' impact on his business. First, in a letter dated September 6, 1988, Ricci noted the geographic proximity of the four new stores to his store and the two others in the area. He opined that the area could not support "this kind of growth" and that sales volume had fallen from $825,000 to $575,000. See Callicott Aff.Ex. B. By 1992, Windsor accumulated close to $300,000 in debt to Hallmark.

### B. 1993 Security Agreement and Addendum

In August 1993, Ricci wrote to Doyle Reed ("Reed"), Hallmark's Vice–President of Trade Development, explaining that the new stores had caused a decrease in sales, thereby hindering Windsor's ability to pay off its debt to Hallmark. By the fall of 1993, the debt was nearly $400,000. In October 1993, the parties entered into a Security Agreement, which was secured by a Promissory Note for $464,427.08.[2] See Callicott Ex. G,

1. Although Hallmark does not make exclusivity agreements with retailers, it grants certain financial incentives and special benefits to retailers under its Gold Crown Program, of which Windsor was a member. Windsor claims that one of the Program's perks was that Hallmark would give a member-retailer the first chance to acquire any new store in that retailer's area. Windsor concedes, however, that this alleged agreement was never reduced to writing. Hallmark's Field Reference Manual does require, however, that Hallmark provide notice to current retailer of any new store openings in the relevant market

area. Ricci Certification Ex. B at 3–32. Windsor contends that it did not receive notice from Hallmark of the opening of new stores in the area. Nevertheless, the Manual does not guarantee existing retailers the opportunity to veto new accounts.

2. The agreement required the following payments: $40,000 on January 10, 1994; $65,000 on January 10, 1995; $75,000 on January 10, 1996; $80,000 on January 10, 1997; and $126,741 on January 10, 1998.

H. Windsor was the primary signatory and the individual plaintiffs signed as guarantors. After the agreement was signed, Windsor requested a debt reduction. Hallmark agreed and the parties signed an Addendum to the Security Agreement on October 21, 1993. Callicott Aff.Ex. J. The Addendum reduced the debt to $183,000, payable in one lump sum by February 1, 1996.[3] This amount has not yet been paid by Windsor.

## C. January 1996 Settlement Offer

In 1994, Windsor ceased operations as a Hallmark licensee and entered into an agreement with American Greetings Corporation. By letter dated January 4, 1996, Ricci requested a further reduction of the debt owed Hallmark and reiterated his belief that the opening of the additional stores in 1987 and 1988 caused Windsor's financial instability. *See* Callicott Aff.Ex. D. In response to Ricci's letter, Hallmark made a new settlement proposal via letter dated January 24, 1996. *See* Callicott Aff.Ex. K. Hallmark agreed to accept $100,000 in full satisfaction of the debt, provided that $50,000 was paid on February 28, 1996 and $50,000 was paid on December 10, 1996. Hallmark's offer demanded a response from Windsor no later than February 15, 1996.

In response to Hallmark's offer, on February 14, 1996, Windsor phoned G. Thomas Callicott ("Callicott"), Hallmark's now-retired Relationship Development Director. Both parties agree that Windsor accepted the offer to pay $100,000. *See* Def.Reply Br. at 8; Ricci Certification ¶ 72. However, after accepting the debt reduction, Ricci offered an alternate payment schedule: to pay $25,000 immediately and $75,000 on December 31, 1996, or, in the alternative, to pay the entire $100,000 in December 1996.[4] Callicott avers that he flatly rejected Ricci's counterproposal. *See* Callicott Aff. at ¶ 18. Ricci claims that Callicott said he would consider the counteroffer and get back to him. By letter dated March 18, 1996, Hallmark notified Windsor that the settlement offer of January 24, 1996 was no longer an option and that the full amount of the debt was due and owing. Hallmark maintained that Windsor breached the Addendum to the 1993 Security Agreement, thereby reviving Windsor's obligation to pay Hallmark $386,000, the amount of the original debt.

By letter dated April 12, 1996, Ricci told Callicott that Windsor had accepted the offer to settle for $100,000 during the February 14, 1996, phone conversation and that the challenge to the method of payment should not nullify that acceptance. On May 2, 1996, Hallmark responded by letter, stating that the new proposal, raised by Ricci during the February phone conversation and confirmed by the April letter, was unacceptable to Hallmark and that the original amount of the debt was still due. In the same May 2, 1996 letter, Hallmark informed Windsor that Hallmark would pursue legal remedies if Windsor failed to produce a new proposal by May 20, 1996. Four months later, Windsor commenced this litigation.

## D. Procedural History of this Lawsuit

On September 24, 1996, Windsor filed, but did not serve, a complaint in the Superior Court of New Jersey, including three counts and seeking the following relief from Hallmark: (1) a declaratory judgment that Hallmark breached its contract when it opened additional stores in 1987 and 1988; (2) specific performance of the "contract" to settle the case for $100,000; and (3) damages for lender liability. *See* Morrison Aff.Ex. C. Hallmark filed suit in Missouri on October 7, 1996 to enforce the original 1993 Security Agreement and to recover the full amount of the debt plus interest—an amount totaling $480,356 at the time Hallmark's affidavits were filed. *See* Callicott Aff. at ¶ 19; Morrison Ex. D. That lawsuit has since been

---

3. The sum of $183,000 was computed by combining the first three payments due under the Security Agreement, plus $3,000. *See supra* note 2.

4. There is some dispute as to whether Windsor first accepted Hallmark's proposed payment schedule and then offered an alternative scheme, or whether Windsor accepted the dollar amount only and then proposed the alternate payment schedule. *See infra* note Part II.D n. 12.

removed to federal court in Missouri. On October 9, 1996, plaintiffs served an amended complaint on the defendants, which added Hallmark Marketing Corporation as a defendant and included essentially the same counts as the unserved complaint of September 24, 1996.

On November 5, 1996, Windsor served a Second Amended Complaint on Hallmark. *See* Morrison Ex. E. The amended complaint alleged the following counts: (1) breach of contract, (2) fraud, (3) violation of the New Jersey Consumer Fraud Act, (4) negligence, (5) equitable fraud, (6) unfair trade practices, (7) violation of the New Jersey Franchise Practices Act, (8) detrimental reliance, and (9) duress. On November 7, 1996, Hallmark removed the action to this Court. On November 13, 1996, plaintiffs filed another version of their second amended complaint, which presented counts identical to those in the first version. *See* Morrison Aff.Ex. A.

## II. DISCUSSION

Hallmark filed a motion to dismiss for failure to comply with the applicable statute of limitations and for failure to state a claim upon which relief can be granted. Because defendants submit affidavits and exhibits in support of their motion, we treat it as one for summary judgment. *See* Fed.R.Civ.P. 12(b).

### A. Standard for Summary Judgment

Under Fed.R.Civ.P. 56(c), a court may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The non-moving party may not simply rest on its pleadings to oppose a summary judgment motion but must affirmatively come forward with admissible evidence establishing a genuine issue of fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

In deciding a motion for summary judgment, the Court must construe the facts and inferences in a light most favorable to the non-moving party. *See Pollock v. American Telephone & Telegraph Long Lines*, 794 F.2d 860, 864 (3d Cir.1986). The role of the court is not "to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

The substantive law governing the dispute will determine which facts are material, and only disputes over those facts "that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510. A genuine issue for trial does not exist "unless the party opposing the motion can adduce evidence which, when considered in light of that party's burden of proof at trial, could be the basis for a jury finding in that party's favor." *J.E. Mamiye & Sons, Inc. v. Fidelity Bank*, 813 F.2d 610, 618 (3d Cir.1987) (Becker, J., concurring).

### B. Statute of Limitations

#### 1. *Accrual*

In New Jersey, a breach of contract claim must be filed within six years after the cause of action has accrued. *See* N.J.S.A. 2A:14–1. "Under New Jersey law, a cause of action is deemed to accrue for statute of limitations purposes when the potential plaintiff knows of his or her injuries and of facts sufficient to attribute those injuries to the fault of another." *See Cruz v. City of Camden*, 898 F.Supp. 1100, 1106 (D.N.J.1995) (citing *Viviano v. CBS, Inc.*, 101 N.J. 538, 546, 503 A.2d 296, 300 (1986)). Eight out of nine of plaintiffs' claims depend either upon the opening of additional Hallmark stores in 1987 and 1988 or on the representations made at the time the original agreement between the parties was signed in 1968. Thus, the allegedly actionable conduct took place at least eight, possibly twenty-nine years ago—far outside the limitations period.

Furthermore, plaintiffs were aware of their potential injury from these events at

the time they occurred. Plaintiffs admit they were on notice of the opening of the stores in 1988. They claim, however, that they were not yet aware of the effect that the stores would have on their business. *See* Pl.Br. at 6. Nevertheless, plaintiffs' own correspondence belies this assertion. By letter dated September 6, 1988, Ricci complained of the store openings and noted a fall in sales volume. In 1993, Ricci made similar complaints. *See* Callicott Aff.Ex. C.

Thus, for eight of the nine counts in the complaint, the statute of limitations began to run by 1988 at the latest. Plaintiffs do not even dispute that the statute of limitations has run on these claims. *See* Pl.Br. at 18 ("It is clear that Windsor did not file its claim within the statutory period."). Instead, plaintiffs offer unpersuasive equitable tolling arguments.

### 2. *Time–Barred Claims*

In Count One, plaintiffs alleges that the market saturation effects of the opening of new Hallmark stores in 1987 and 1988 in Windsor's geographic area constituted a breach of the covenant of good faith and fair dealing that accompanied the parties agreement. As mentioned above, Windsor was aware of the new openings as they occurred and immediately connected sales volume reductions to the increase in stores in the area. *See* Pl.Ex. B.

In Count Two, Windsor seeks recovery for alleged misrepresentations by Hallmark that it would not open additional stores in a limited market area. The complaint alleges that these misrepresentations led plaintiffs to agree to operate as a Hallmark store. Thus, it is possible that these representations were made when the parties first agreed to this arrangement in 1968. Plaintiff also claims that the misrepresentations led plaintiffs to agree to become indebted to Hallmark, which means that at the least, the misrepresentations were made when Hallmark opened the new stores. Regardless, the allegedly actionable events underlying Counts One and Two occurred outside of the statute of limitations.[5]

In Count Three, Windsor claims that Hallmark violated the New Jersey Consumer Fraud Act ("NJCFA"), N.J.S.A. 56:8–1 *et seq.*, because Hallmark "utilized certain unconscionable commercial practices, deception, fraud, false pretenses, false promise, or misrepresentations." The only allegedly "unconscionable" practices and fraud occurred in conjunction with the negotiation of the retailer agreement and with the opening of the new stores. Both of these events occurred more than six years ago.[6]

Count Four alleges that Hallmark was negligent because it breached its duties "to operate in a manner that would not interfere

---

5. Even if Counts One and Two had been timely brought, we believe, although we are not so ruling, that they would not constitute viable claims for relief. Hallmark and Windsor did not have an exclusivity agreement. Moreover, there was no written agreement requiring Hallmark to give Windsor a right of first purchase for stores in the area. Therefore, it is doubtful that the opening of the new stores constituted a breach of a contract.

6. Even if this claim were not time-barred, we would still dismiss it. Windsor does not have standing to recover under the NJCFA because it does not qualify as a "consumer." A consumer is "one who uses (economic) goods, and so diminishes or destroys their utilities." *Hundred E. Credit Corp. v. Eric Schuster*, 212 N.J.Super. 350, 355, 515 A.2d 246, 248 (App.Div.), *cert. denied*, 107 N.J. 60, 526 A.2d 146 (1986). Both individuals and corporations can qualify as consumers if they fit the definition. *See id.*, 515 A.2d at 248. In the Hallmark–Windsor relationship, Windsor purchased the goods at wholesale to sell to its store customers. Windsor did not diminish or destroy the utility of the goods. Thus, Windsor cannot sue as a consumer of goods under NJCFA. Windsor argues that it should qualify as a consumer because it purchased *services* related to financial planning, store planning, and merchandising. *See* Pl.Br. at 24. First, plaintiffs ground their NJCFA claim on Hallmark's "effort to sell Hallmark *products* to Windsor." *See* Complaint ¶ 43 (emphasis added). Thus, the "services" argument appears to be nothing more than an afterthought, included in a brief as a last-ditch effort to sustain an NJCFA claim.

The NJCFA applies to the sale or advertisement of "merchandise," *see* N.J.S.A. 56:8–2, which is defined as "any objects, wares, goods, commodities, services or anything offered, directly or indirectly to the public for sale," N.J.S.A. 56:8–1(c). Financial planning, store planning, and merchandising services are not services that are sold to the general public. Therefore, those

with the operations of Windsor stores" and "to support Windsor in a manner that would assist Windsor in its stated goal of earning a reasonable profit." Compl. ¶¶ 48, 49. Again, the allegedly negligent conduct—"inundating the geographic area in and around certain Windsor Hallmark stores with other Hallmark stores"—occurred in 1987 and 1988. Thus, Count Four is also barred by the statute of limitations.[7]

■ In Count Five, plaintiffs claim that Windsor "became indebted" to Hallmark as a result of Hallmark's misrepresentations. Windsor argues that these misrepresentations constituted "equitable fraud," thereby

warranting rescission of the debt.[8] Windsor states, elsewhere in the complaint, that it became indebted to Hallmark following the opening of the new stores. Compl. ¶ 59. Again, the allegedly illegal conduct occurred in 1987 and 1988 and the claim is time-barred.[9]

Count Six avers that the opening of new stores was an unfair trade practice. This allegedly unfair trade practice occurred in 1987 and 1988. Because the statute of limitations expired in 1993 or 1994, the cause of action is time-barred.[10]

■ Plaintiffs allege in Count Seven that Hallmark's acts violate the New Jersey

---

services are not "merchandise" under the NJCFA. The type of services that Windsor identifies can at best be characterized as promises that were implied by the Hallmark–Retailer contract. If we were to read the NJCFA as covering those "services," we would be construing the statute to allow recovery for any breached promise in connection with a contract for the sale of merchandise. We decline to allow such a broad reading of the statute. *See Barry v. New Jersey State Highway Auth.*, 245 N.J.Super. 302, 309, 585 A.2d 420, 423 (N.J.Ch.1990) ("If the intent [of the Act] is to protect consumers from fraud and fraudulent practices in the sale of goods and services, as has been stated, then certainly something more than a mere breach of contract is required."). These services, if offered, were collateral to a contract for the sale of products to a wholesaler. As such, they do not qualify Windsor as a consumer under the NJCFA. *See BOC Group v. Lummus Crest*, 251 N.J.Super. 271, 278, 597 A.2d 1109, 1112 (Law Div.1990). Accordingly, Windsor's NJCFA claim is without merit.

7. Even if the limitations period had not expired, this count might also be dismissed for failure to state a claim upon which relief can be granted. *See supra* note 4.

8. Moreover, plaintiffs allegations do not appear to support "rescission" of the debt. If a party to a contract is guilty of misrepresentation, the contract is voidable. *See Marcangelo v. Boardwalk Regency Corp.*, 847 F.Supp. 1222, 1230 (D.N.J. 1994), *on subsequent appeal*, 47 F.3d 88 (3d Cir.1995). The victim has the choice of affirming or rescinding the contract. *See id.* The party that chooses to rescind must return whatever it received under the contract, *see id.* at 1231 (citing *Merchants Ind. Corp. v. Eggleston*, 37 N.J. 114, 130, 179 A.2d 505, 513 (1962)), but may be entitled to restitution in the amount by which the defrauding party has been enriched, *see id.*

Windsor seeks to rescind *the debt* that it owes. Under contract law, if misrepresentations were made, Windsor would have the option of rescinding its *agreement* with Hallmark—the Policy Statement signed in 1968. This would be the legal equivalent of "calling off the deal." *See* 1 Dan B. Dobbs, Law of Remedies, § 4.3(6) (2d ed. 1993). Even if there had been fraudulent representations, rescission would not be an appropriate remedy. Windsor could not fulfill its obligation to return the Hallmark merchandise to Hallmark because it has already been sold to customers. Moreover, the proposition that Hallmark has been unjustly enriched by the contract is a dubious one. Hallmark has not received performance under the contract—Windsor has not yet paid for the goods. In sum, rescission of the debt is not a cognizable remedy and rescission of the entire agreement is inappropriate.

9. To the extent Count Five seeks equitable relief, it would be governed by the doctrine of laches, which, similar to a statute of limitations, bars claims that were neglected for an unreasonable and unexplained length of time. *See Atlantic City v. Civil Serv. Comm'n*, 3 N.J.Super. 57, 60, 65 A.2d 535, 536 (App.Div.1949). Laches may bar a claim *before* the time fixed by the analogous statute of limitations has passed. *See Patterson v. Hewitt*, 195 U.S. 309, 319, 25 S.Ct. 35, 37, 49 L.Ed. 214 (1904). Generally speaking, however, where a legal and an equitable remedy exist for the same cause of action, equity will follow the limitations statute. *See Lavin v. Board of Ed. of Hackensack*, 90 N.J. 145, 153 n. 1, 447 A.2d 516, 520 n. 1 (1982). At the most, therefore, laches allows plaintiffs the same six-year period permitted by the applicable statute of limitations. Accordingly, Count Five would be barred under both doctrines.

10. Once again, even if the limitations period had not expired, this count might also be dismissed for failure to state a claim upon which relief can be granted. *See supra* note 4.

Franchise Practices Act. Strangely, plaintiff does not identify the nature of these "acts." Nevertheless, the only acts referenced in the complaint are ones that occurred in 1968, 1987 or 1988, thereby barring these claims under the statute of limitations.[11]

Count Eight avers that Hallmark made certain promises to induce Windsor into operating its stores under the Hallmark logo. As a result of Windsor's detrimental reliance on these promises, plaintiffs seek damages. This alleged inducement must have taken place in 1968 when Hallmark and Windsor first entered into their agreement. Thus, the claim is barred by the applicable statute of limitations.

### 3. Equitable Tolling

■ Plaintiffs argue that the statute of limitations should be tolled because Hallmark lulled Windsor into inaction. Ricci claims that he did not pursue legal action in 1993 because he thought that all differences between the two companies had been settled by the addendum to the Security Agreement. Ricci Aff. at ¶ 87. We are unpersuaded by this argument.

New Jersey recognizes certain circumstances in which the statute of limitations will be tolled for equitable reasons. See Knight v. Brown Transp. Co., 806 F.2d 479, 484 (3d Cir.1986). Those circumstances, however, have been narrowly limited by court decisions. See id. Equitable estoppel to plead a statute of limitations defense must be an exception rather than the rule. See id. at 487. "It will not be invoked against a defendant when the plaintiff has been less than diligent in pursuing and pressing his claims." Id. One situation in which the statute of limitations can be tolled is when the defendant "lull[s] the plaintiff into a false sense of security by representing that a claim will amicably be settled without the necessity for litigation." See id. (quoting Lawrence v. Bauer Publishing and Printing Ltd., 78 N.J. 371, 376, 396 A.2d 569, 572 (1979) (Pashman, J., concurring)).

Windsor argues that it "gave up its claim . . . in favor of entering into a settlement agreement with Hallmark." Pl.Br. at 17. There are two problems with this argument. First, the settlement agreements pertained to the issue of debt reduction and delayed payment. They did not address the issue of whether Hallmark violated any agreements or duties when it opened the new stores. Second, it was Windsor, not Hallmark, that breached the settlement agreement after the statutory period had expired. Windsor failed to make timely payments under the Addendum to the Security Agreement, the last agreement to be signed by both parties.

Windsor alleges that Hallmark composed a settlement agreement within the statutory period that provided for performance after the statute of limitations had run. Windsor claims that this was problematic because "[o]nce the performance date passed, Hallmark claimed that the new settlement was never accepted and that Windsor was in default." Pl.Br. at 17. This version of the facts is inaccurate.

What actually occurred was that Hallmark reduced Windsor's debt to $183,000, as reflected in the Addendum to the Security Agreement, signed in October 1993. Hallmark never reneged on that deal. Windsor, a month before payment was due under the Addendum, requested a further debt reduction. Hallmark responded with a further plan for debt reduction. Windsor's response proposed a different payment schedule,

---

**11.** Plaintiffs' NJFPA count fails to state a claim upon which relief can be granted. The NJFPA "applies only to a franchise (1) the performance of which contemplates or requires the franchisee to establish or maintain a place of business within the State of New Jersey (2) where gross sales of products or services between the franchisor and the franchisee covered by such franchise shall have exceeded $35,000 for the 12 months next preceding the institution of suit pursuant to this act, (3) where more than 20% of the franchisee's gross sales are intended to be or are derived from such franchise." N.J.S.A. 56:10–4(a). Even if Windsor were to qualify as a franchise, see N.J.S.A. 56:10–3(a), plaintiffs fail to satisfy all of the NJFPA requirements. Hallmark has not sold anything to Windsor since 1994, the year in which Windsor switched to an American Greetings store. Ricci Aff. ¶ 66. Finally, plaintiffs have not pled facts sufficient to support any of the enumerated prohibited practices under the NJFPA. See N.J.S.A. 56:10–7 (listing seven prohibited practices).

thereby changing the terms and killing the offer. It was this later "settlement" that Hallmark claims was never accepted. Therefore, Hallmark declared Windsor in default after the due date for payment under the Addendum, which still remained in effect.

In sum, Windsor is not a party properly situated to receive an "equitable" remedy. Windsor repeatedly refused to comply with Hallmark's schedule for payments of a drastically reduced debt. Windsor did not put Hallmark on notice that Windsor believed it had a cause of action for breach of contract, fraud, etc. Hallmark's "settlements" were efforts to resolve Windsor's debt and were not framed as a plan to settle any potential claim by Windsor against Hallmark.

### C. Duress

█ Plaintiffs' claim for duress is the only one that survives a statute of limitations defense. Nevertheless, the claim must be dismissed because plaintiffs fail to state a claim upon which relief can be granted. In 1993, plaintiffs signed a Promissory Note, entered into a Security Agreement, and executed personal guarantees for the debt. The complaint alleges that plaintiffs signed the note because they were under duress. As to the guarantees, Ricci states that "Hallmark made it very clear to us that they would not enter into any agreement without the guarantees." *See* Ricci Aff. at ¶ 58. Ricci further claims that plaintiffs felt that the consequences of not signing would be that Hallmark would drive Windsor out of business, either by revoking Windsor's Gold Crown status or refusing to ship additional merchandise. *See id.* at ¶ 59.

Plaintiffs correctly point out that New Jersey courts recognize that an otherwise enforceable contract may be invalidated if it was entered into under "economic duress," *Glenfed Financial Corp. v. Penick Corp.,* 276 N.J.Super. 163, 171, 647 A.2d 852, 856 (App. Div.1994), *cert. denied,* 139 N.J. 442, 655 A.2d 444 (1995), and that the decisive factor of such duress is the "wrongfulness of the pressure exerted," *id.* However, plaintiffs fail to note that the *Glenfed* court also articulated the following highly relevant rule of law:

There is of course an element of compulsion anytime a creditor asks a debtor in default to agree to anything; the creditor holds the upper hand. However, that does not mean that [the debtor's] agreement to [the creditor's] demand constituted actionable economic duress. A creditor's exercise of its right to declare a loan in default or to forbear from taking such action only upon a debtor agreeing to certain modifications in the agreement is not "wrongful conduct" and therefore does not constitute economic duress.

*Glenfed,* 647 A.2d at 857.

Even if we "look to the condition of the mind[s] of the person[s] subject to coercive measures," *Shanley & Fisher v. Sisselman,* 215 N.J.Super. 200, 212, 521 A.2d 872, 878 (App.Div.1987), as plaintiffs ask us to do, and accept that they did indeed feel "coerced," such feelings are insufficient to constitute economic duress in the context of the debtor-creditor relationship. Although the Hallmark–Windsor relationship could be characterized as more elaborate than that of a typical creditor and debtor (given that Hallmark supplied Windsor with products and had some influence over Windsor's operations), the specific transaction in which duress was allegedly imposed involved nothing more than a debt renegotiation, unaccompanied by threats of closing Windsor's stores, removing store fixtures, halting product shipments, or taking any other sort of negative action to drive Windsor out of business.

Moreover, if plaintiffs' theory of the case is true, they conceivably had considerably more leverage in 1993—with which to resist this alleged coercion—than they care to admit. At that point, plaintiffs still had time left in the limitations period to file a lawsuit. We know that plaintiffs' theory that there was an illegal connection between the debt owed and Hallmark's conduct has already been solidified. Plaintiffs could have threatened to or actually filed a complaint to avoid signing the agreement and the guarantees. Thus, plaintiffs cries of coercion are not very credible given that they actually contradict plaintiffs' very own theory of this case. Accordingly, the claim for duress is dismissed.

## D. Motion to Amend Complaint

■ Plaintiffs filed a cross-motion to amend their complaint to enforce "the settlement agreement" of February 1996. In the alternative, plaintiffs seek to enforce Paragraph IV of the Security Agreement, which they believe mandates Hallmark to purchase Windsor's Berkshire Mall store if Windsor defaults on its obligations. The motion is denied.

Under Fed.R.Civ.P. 15(a), leave to amend a complaint shall be freely given in the absence of circumstances such as undue delay, bad faith or dilatory motive, undue prejudice to the opposing party or futility of amendment. *See Foman v. Davis,* 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). A court may deny a motion to amend based on undue delay when the movant is unable to "satisfactorily explain" the reasons for delay. *See Fishbein Family Partnership v. PPG Indus., Inc.,* 871 F.Supp. 764, 768 (D.N.J.1994). Amendment of the complaint is futile if the amended complaint could not withstand a renewed motion to dismiss. *See Jablonski v. Pan American World Airways, Inc.,* 863 F.2d 289, 291 (3d Cir.1988). For denial of a motion to amend, the proposed amendment must be clearly futile. *See Fishbein,* 871 F.Supp. at 768. In this case, not only has there been undue delay but also the new claims would most likely be futile. Thus, rather than allow the plaintiffs to amend the complaint only to have those claims dismissed on a future motion for summary judgment or to dismiss, we will deny the motion to amend.

Plaintiff has already filed four complaints in this matter. On September 24, 1996, plaintiffs filed, but did not serve, a complaint that included a claim for specific performance of the "agreement" to settle the debt for $100,000. An amended complaint was served on October 9, 1996, which also included the specific performance count. However, when plaintiff filed another amended complaint on November 5, 1996, that claim had been eliminated. Plaintiffs' submissions not only fail to offer a "satisfactory" explanation as to why this claim was dropped and now reasserted, but they do not offer any explanation at all. It is obvious that plaintiffs had knowledge of this potential claim when the governing complaint was filed. Thus, it appears that plaintiffs' amendment is a last-ditch effort to add a claim that would reduce their liability.[12]

■ Although we are confident that plaintiffs unduly delayed the assertion of their enforcement claim and that such delay provides a sufficient ground for denying the motion to amend, we will also engage in a futility analysis. Plaintiffs' request to amend to enforce "the agreement" of February 1996 is meritless. Such an "agreement" never existed. Hallmark offered, in writing, to reduce the debt to $100,000, with $50,000 to be paid on February 28, 1996 and $50,000 to be paid on December 31, 1996. Hallmark gave Windsor until February 15, 1996 to respond. On February 14, 1996, Windsor responded by accepting the dollar amount of the settlement and then asking to pay $25,000 in February and the remainder in December 1996, or to pay the entire amount in December 1996.[13]

---

**12.** At oral argument, counsel for Windsor offered two less than satisfactory explanations as to why the specific performance claim was dropped from the lawsuit: (1) as a strategic move, and (2) because discovery was necessary. The Court finds it difficult to believe that discovery was needed in order to pursue this claim given that it depends solely on the parties' competing versions of a telephone conversation. Counsel's strategic goals are also insufficient to justify this pleading game. Modern pleading doctrine and efficient case management prohibits parties from holding back claims for strategic reasons. If the claims are known to counsel, they should be plead in the alternative. Apparently, counsel for Windsor wanted to try to absolve Windsor of all its debt rather than suggesting payment of $100,000 as an alternative resolution of the dispute. It was

only when Windsor was faced with the instant motion for summary judgment that it attempted to lay all of its cards on the table. This admitted goal persuades us to deny, rather than grant, Windsor's motion to amend.

**13.** In oral argument, counsel for Windsor represented that Ricci first accepted Hallmark's proposed payment schedule and thereafter proposed a modification. The affidavits and certifications, however, do not lend support this interpretation of the phone conversation between Callicott and Ricci. The papers suggest that although Ricci may have "accepted" the $100,000 dollar amount, the payment schedule was unsuitable to Windsor. Because we view the amount of the settlement and its payment terms as part of the same offer, not as two offers inviting separate

A contract must arise from offer and acceptance, and must be sufficiently definite "that the performance to be rendered by each party can be ascertained with reasonable certainty." *Weichert Co. Realtors v. Ryan,* 128 N.J. 427, 435, 608 A.2d 280, 284 (1992). If parties agree on essential terms and manifest an intention to be bound by those terms, they have created an enforceable contract. *See id.* Where the parties do not agree to one or more essential terms, however, courts generally hold that the agreement is unenforceable. *See id.* New Jersey courts have held that there must be an unqualified acceptance to conclude the manifestation of assent. *See id.*

It is unclear whether Windsor accepted Hallmark's offer of January 24, 1996. Windsor suggested an alternative payment schedule for the $100,000. Plaintiffs argue that the payment schedule was a non-essential term. Thus, their argument goes, its alteration should not have amounted to a rejection of Hallmark's offer. We disagree. In order for performance by each party to be ascertainable with reasonable certainty, a contract that renegotiates a debt must at the least include the amount and the payment schedule. The performance to be rendered by the plaintiffs is not ascertainable because plaintiffs' response altered the essential terms, thereby constituting a rejection of the offer. Plaintiffs' response to the Hallmark's offer fell far short of an "unqualified acceptance;" they made a counteroffer that killed the original offer. Hallmark never accepted that counteroffer. Even we construed Windsor's response as an acceptance of the offer to pay $100,000, we note Windsor never tendered payment—even according to Windsor's own payment schedule. At the least, the tendering of payment would be evidence of Windsor's intent to be bound by the $100,000 deal. Nevertheless, without mutual assent as to the payment schedule and without the ten-

dering of payment, we find it unlikely that an enforcement agreement was formed.

Plaintiffs argue that the court can play a gap-filling role when the parties to a contract leave open the content of an essential term. Pl.Br. at 20. In the cases that plaintiffs cite to support this argument, however, the parties had already executed an agreement that had either missing or vague terms. *See Mazzeo v. Kartman,* 234 N.J.Super. 223, 230–31, 560 A.2d 733 (App.Div.1989); *Paley v. Barton Savings and Loan Ass'n,* 82 N.J.Super. 75, 83, 196 A.2d 682, 686 (App. Div.), *cert. denied,* 41 N.J. 602, 198 A.2d 446 (1964). In the case at bar, however, the parties never reached an agreement. Hallmark's offer provided all of the necessary terms and Windsor altered them. Therefore, we find it unlikely that Hallmark's January 24, 1996 letter proposal is enforceable as an "agreement." The 1993 Agreement, under which Windsor owed $183,000, remained in effect. Plaintiffs' request to amend the complaint is denied.[14]

Plaintiffs' alternate request is that the court enforce Paragraph IV of the Security Agreement. Plaintiffs allege that this paragraph obligated Hallmark to buy the Berkshire Mall store upon default. The plain language of the agreement, however, states that Windsor must agree to sell the store to Hallmark in the event of a default. The provision neither prohibits Hallmark from pursuing other remedies upon default nor does it mandate that Hallmark buy the store. Therefore, this claim is also likely to be futile and the plaintiffs should not be permitted to add it to the complaint.[15]

## III. CONCLUSION

We find that Counts One through Eight of plaintiffs' complaint are barred by the expiration of the applicable statute of limitations and should be dismissed. The remaining

---

acceptances, and because Windsor failed to tender payment under Hallmark's schedule—the one they claim to have accepted—we find that it is unlikely that an agreement was reached between the parties. However, the Court makes no ruling on this issue other than to deny the amendment. *See infra* note 14.

**14.** We note that the issue of whether the 1996 proposal was accepted by Windsor is not squarely before us. This Court's denial of the motion to

amend as to the enforcement of that proposal is without prejudice to Windsor's right to assert that claim as a counterclaim in the federal suit in Missouri.

**15.** Again, our decision to deny the amendment as to Paragraph IV of the Security Agreement is without prejudice to Windsor's right to assert that claim in the Missouri lawsuit.

claim, for duress, must be dismissed for failure to state a claim upon which relief can be granted. We also find that plaintiffs' cross-motion to amend the complaint should be denied. Accordingly, plaintiffs' complaint is dismissed in its entirety. An appropriate order will issue on even date herewith.

### ORDER OF DISMISSAL

This matter having appeared before the court on defendant's motion to dismiss, or in the alternative for summary judgment, and on plaintiffs' cross-motion for leave to amend the complaint, the court having reviewed the submissions of the parties, and having heard oral argument, for the reasons set forth in an opinion issued on even date herewith,

**IT IS** on this 20th day of February, 1997,

**ORDERED THAT:**

1. Defendant's motion for summary judgment is hereby **GRANTED.**

2. Plaintiffs' complaint is hereby **DISMISSED** in its entirety for failure to comply with the statute of limitations and for failure to state a claim upon which relief can be granted.

3. Plaintiffs' cross-motion for leave to amend the complaint is hereby **DENIED** without prejudice to plaintiffs' right to assert those claims in the pending lawsuit in Missouri.