**ROSEMONT GARDENS FUNERAL CHAPEL–CEMETERY, INC., United Community Holdings, Inc. and James F. Robinson Plaintiffs**

v.

**TRUSTMARK NATIONAL BANK, Gulf National Life Insurance Company and Gulf Holdings, Inc. Defendants**

No. CIV.A. 3:02CV1798LN.

United States District Court,
S.D. Mississippi,
Jackson Division.

May 24, 2004.

Craig M. Geno, Jeffrey Kyle Tyree, Haris Geno, PA, Jackson, Richard P. Johnson, Larry O. Norris, Hattiesburg, Carroll H. Ingram, Ingram & Associates, Hattiesburg, MC, for Plaintiffs.

William H. Leech, Mark H. Tyson, Beth L. Orlansky, McGlinchey Stafford, Jackson, for Defendants.

## MEMORANDUM OPINION AND ORDER

TOM S. LEE, District Judge.

This cause is before the court on a number of motions by defendants Trustmark National Bank (Trustmark), Gulf National Life Insurance Company and Gulf Holdings, Inc., including their motion and supplemental motions for summary judgment on the claims brought against them in this cause by plaintiffs Rosemont Gardens Fu-

neral Chapel–Cemetery, Inc. (Rosemont), United Community Holdings, Inc. and James F. Robinson; their motion for summary judgment on their counter-claim against James Robinson; their motion to strike portions of the affidavits of James Robinson and Margaret Lauro; their motion for removal of inadvertently disclosed privileged document from the record and for return of same; and their motion to strike supplementation to plaintiffs' designation of expert witnesses. These motions have been fully briefed by the parties.

The court has first considered defendants' summary judgment motions, which has necessarily also involved consideration of defendants' motion to strike pertaining to the Robinson and Lauro affidavits.[1] For reasons to be fully explained herein, the court concludes that summary judgment is appropriate both as to plaintiffs' claims against defendants and as to defendants' counter-claim against Robinson.

This action stems from certain loan transactions in which Rosemont and its owner, Robinson, borrowed, collectively, in excess of $2.2 million from Trustmark which was secured by a deed of trust from Rosemont. When Rosemont and Robinson, as co-maker on the loan, proved unable to make the monthly payments established by the notes, Robinson sought to negotiate a restructuring of the terms of the loans for the purpose of lowering the monthly payments. Although the parties' respective versions of the negotiations and their outcome are rather at odds, a matter which will be addressed more fully *infra*, it is clear that they ultimately failed to agree on specific terms and conditions for modification of the original loan terms and, with plaintiffs in default on their repayment obligation, Trustmark initiated foreclosure

---

1. The court has also considered defendants motion for removal of inadvertently disclosed privileged documents from the record and for return of same from plaintiff. The court is not persuaded that defendants have adequately established a basis for the requested relief and accordingly concludes that this motion should be denied.

proceedings, which, in turn, prompted Rosemont to file for bankruptcy protection. In the wake of these events, Rosemont and Robinson filed the present lawsuit charging that "Trustmark's failure to negotiate in good faith with the Plaintiffs toward a reasonable restructuring of the lending arrangement has left the Plaintiffs' business in a financially precarious position with its survival in jeopardy."

As gleaned from a thorough review of the record, the following facts are undisputed.

For more than forty years, James Robinson has been a principal in the business of funeral home ownership and operation, burial insurance and life insurance, with his principal place of business in central and southwest Mississippi. During that same time, Jerry O'Keefe, a principal in defendants Gulf Holdings, Inc. and Gulf National Life, has also been a principal in the same types of business, in competition with Robinson. In 1995, Robinson sold his existing company, Protective Service Life Insurance Company, and created Rosemont Gardens Memorial Park, a cemetery and funeral home in South Jackson, buying and developing the real property and constructing a funeral home on the property. Rosemont opened for business in April 1998.

In June 1998, Rosemont and Robinson executed and delivered to Trustmark two promissory notes, in the principal sums of $400,000 and $2,200,000, (hereinafter Notes 1 and 2, respectively), both secured by deeds of trust executed by Rosemont in favor of Trustmark and the latter of which was also secured by a pledge of all Rosemont's accounts, chattel paper, returned or repossessed goods, contract rights and general intangibles. On August 28, 1998, Gulf Coast and Gulf Holdings each purchased a ($650,000) 29.5% participation in Note 2.[2] Gulf Holdings promptly assigned its participation interest to Gulf Coast, giving Gulf Coast a 59% participation interest in Note 2.

From the inception of the notes, Robinson subsidized the $18,568.97 monthly payment with personal funds since Rosemont's business was not generating sufficient income to cover the note. By mid–2001, however, Robinson was unable to continue the payments and approached Trustmark officials about restructuring the terms of the loan in a way that would allow Rosemont to carry on its business and continue paying the loan. Over a period of months, the parties engaged in discussions but eventually reached an impasse when, in the course of negotiations, Trustmark and/or Gulf Holdings proposed that Rosemont/Robinson transfer Rosemont stock to Gulf Holdings in lieu of interest payments to Gulf Holdings on its participation interest. Upon evaluating the proposal by reference to a formula that Gulf Holdings had proposed and presented to Rosemont/Robinson for the conversion of the interest debt to equity, Robinson rejected the proposal, which he contends would have resulted in Gulf Holdings' gaining control of Rosemont for a fraction of its fair market value.[3]

2. Robinson asserts that he was advised that a 29% participating interest had been purchased by O'Keefe affiliates, but he was not aware that O'Keefe affiliates had actually purchased a participating interest totaling 59% of the loan.

3. Robinson states in his affidavit that in response to his request that Trustmark consider a reduction in the required monthly payments to $10,000.00, "[t]he bank agreed to the requested reduction" and presented for his consideration a proposed Loan Modification document that did not contain provisions for conversion of deferred interest into equity of Rosemont. However, "[p]rior to completion of revision of documentation and before execution of the August 3 monthly reduction agreement," O'Keefe advised Robinson and Trustmark that he intended to "make a sub-

On February 12, 2002 and May 22, 2002, Trustmark sent a notice of default and acceleration, following which it noticed a foreclosure sale of the Rosemont funeral home and cemetery property for July 19, 2002. Rosemont promptly filed for bankruptcy protection.

Plaintiffs' complaint in this cause, as pled, includes the following nine counts: Count 1 for breach by defendants of the "lending agreements with the Plaintiffs;" Count 2 for "tortuous breach of the lending arrangement;" Count 3 for breach of the duty of good faith and fair dealing; Count 4 for negligent misrepresentation; Count 5 for fraudulent misrepresentation; Count 6 for negligence in the banking relationship; Count 7 for conspiracy to commit fraud; Count 8 for punitive damages; and Count 9 for tortuous interference by Gulf National and Gulf Holdings with plaintiffs' business and banking relations with Trustmark. In addition to these claims, plaintiffs are asserting a claim under the anti-tying provisions of the Bank Holding Company Act, 12 U.S.C. § 1972 (BHCA).[4] By their motion, defendants seek summary judgment on each of these claims.

*Bank Holding Company Act*

■ Plaintiffs argue that Trustmark's imposition of a " 'take-it-or-leave-it' condition upon its agreement to reduce Rosemont's loan payments," the beneficiary of which condition was "Trustmark and Gulf—Trustmark's partner and affiliate," constituted a violation of the anti-tying provisions of the BHCA. According to plaintiffs, "Trustmark conditioned the extension of credit to Rosemont upon Rosemont's agreement to provide property (common stock) for the sole benefit of the bank and its affiliate, Gulf." They argue that the fact that Trustmark "imposed the conversion requirement as a condition to its extension of credit" in and of itself establishes a violation of the BHCA. However, there is not sufficient evidence in support of plaintiffs' position to create a triable issue on this putative claim.

stantial equity investment in Rosemont," and sent a letter to Trustmark dated August 16, 2001 in which he declared Gulf Holdings' intent to convert "a substantial portion of [its] participation in the indebtedness between Trustmark … and … Robinson and Rosemont … to an equity position in the controlling corporation." Robinson states that on the basis of this representation by O'Keefe, he "believed that the equity conversion would amount to more than $1 million, and relied on the representation of infusion of capital into the company that would eliminate over $1,000,000 of the Rosemont note/debt and strengthen the financial condition of the company." He was thus taken aback when, in a meeting he attended two weeks later between O'Keefe and officers of Trustmark, "discussions centered around a plan that provided for O'Keefe and affiliated companies to take over Rosemont funeral home and cemetery business" by way of a proposed plan for converting deferred interest due Gulf Holdings into Rosemont stock. Robinson asserts that "[c]ontrary to prior agreement of the parties, on or about November 6, 2001 Trustmark …

submitted revised documentation that included the O'Keefe deferral of interest conversion takeover plan of the company," but that he and Rosemont were unwilling to enter into an agreement with the bank for a monthly payment reduction under this proposed plan. He and Rosemont attempted to negotiate a resolution, but were unwilling to agree to this proposal while Trustmark and O'Keefe remained steadfast in their insistence on an agreement containing the deterred interest conversion provisions. The parties thus came to an impasse.

4. No such claim appears in the complaint, but a review of the docket sheet reflects plaintiffs' submission of an "Anti–Tying Memorandum," filed in accordance with a November 6, 2002 order entered by Judge Charles Pickering, to whom this case was originally assigned. That memorandum explains the basis for a putative BHCA claim and the parties have briefed the present summary judgment motions as though this is among plaintiffs' claims in the case.

■ Plaintiffs rely on 12 U.S.C. § 1972(1)(D) of the BHCA, which provides as follows:

A bank shall not in any manner extend credit, lease or sell property of any kind, or furnish any service, or fix or vary the consideration for any of the foregoing, on the condition or requirement—

(D) that the customer provide some additional credit, property, or service to a bank holding company of such bank, or to any other subsidiary of such bank holding company....

To have an actionable claim under this anti-tying provision of the BHCA, plaintiffs must prove that a benefit was conferred by the challenged arrangement to a holding company of the bank or a subsidiary of a bank holding company. Although plaintiffs repeatedly describe Gulf Holdings as a "partner" and "affiliate" of Trustmark, and declare that Trustmark's conditioning of a reduction in Rosemont's monthly payments on the conversion provision was for the "sole benefit of the bank and its affiliate," the proof establishes without challenge that neither Gulf Holdings, nor any O'Keefe affiliate, was a bank holding company or subsidiary of a bank holding company, but rather was an independent company that merely purchased a participating interest in plaintiffs' loan.[5] Thus, even if plaintiffs could show that Trustmark imposed some requirement on plaintiffs for the benefit of Gulf Holdings, this would not constitute a violation of the BHCA because no holding company or subsidiary benefited thereby.[6]

In their brief, plaintiffs also argue that Trustmark violated the BHCA by requiring that Robinson liquidate certain stocks and bonds through Trustmark's investment brokerage facility as a condition of reducing Rosemont's monthly payments. This is also identified in their briefs as a basis for plaintiffs' charge that Trustmark breached its duty of good faith and fair dealing. The court notes, though, that the factual allegations in both the complaint and plaintiffs' Anti–Tying Memorandum relate solely to defendants' having proposed the conversion of interest due from plaintiffs into shares of Rosemont in favor of Gulf Holdings. There is not the slightest hint of any claim relating to plaintiffs' current charge that Trustmark required Robinson to liquidate his securities through its brokerage department and thereby violated the BHCA's anti-tying provisions or its duty of good faith and fair dealing. It would seem unnecessary, therefore, to assess whether summary judgment would be in order as to such claims, since no such claims have been pled in the case.

■ The court does note, however, that notwithstanding Robinson's assertion in his affidavit that the securities were sold through Trustmark's brokerage department as required by Trustmark as a condition for its agreement to reduce Rosemont's monthly payments, it appears from the evidence that the securities were not sold through Trustmark's brokerage department but rather were sold through an outside firm and the proceeds applied to the Rosemont loan. Accordingly, there is no basis for a potential BHCA claim. Moreover, assuming for the sake of argument that Trustmark did actually agree that it would reduce Rosemont's monthly payments if Robinson would liquidate his

---

5. This fact, among others, distinguishes this case from the cases relied on by plaintiffs, including *Dibidale v. American Bank & Trust Co.*, 916 F.2d 300 (5th Cir.1990).

6. Plaintiffs also allege that the proposed conversion arrangement was for the benefit of Trustmark, yet the court fails to perceive from the record any basis for concluding that Trustmark stood to directly benefit from the proposed conversion arrangement.

securities and apply the proceeds of the sale to the loan, as a matter of law, that would not constitute a breach of Trustmark's alleged duty of good faith and fair dealing. First, as discussed *infra,* not only did Trustmark have no duty to negotiate with Robinson and Rosemont toward restructuring the loans, but if it chose to negotiate with them, it would not have been unreasonable or unfair to propose that the borrowers pay down the loan by liquidating other assets as a condition to lowering the borrowers' payments.

*Breach of the Duty of Good Faith and Fair Dealing:*

■ In their motion, defendants point out that under Mississippi law, the duty of good faith and fair dealing applies to the performance of a contract, not its negotiation, *see Cenac v. Murry,* 609 So.2d 1257, 1272 (Miss.1992) (holding that implied duty of good faith and fair dealing is only applicable to the performance or enforcement of a contract, not to negotiation of contract terms), and they argue that since plaintiffs' complaint in this case does not concern the performance of the loan agreements but rather concerns defendants' alleged conduct in the course of *negotiations* for new terms to those agreements, then plaintiffs have no cognizable claim for breach of the duty of good faith and fair dealing. For their part, plaintiffs acknowledge that this implied duty of good faith and fair dealing extends only to the performance, and not the negotiation, of contracts; but their complaint, they argue, *does* relate to Trustmark's conduct in the *performance* of the notes, reasoning that Trustmark failed to deal fairly and in good faith with Rosemont "by agreeing to reduce the loan payments and subsequently refusing to do so under the condition that Rosemont convert common stock to Gulf in exchange for deferred interest payments." For the reasons that follow, plaintiffs' position is unsupportable as a matter of law and of fact.

Plaintiffs have no cognizable claim that Trustmark breached any duty of good faith and fair dealing based on its alleged "performance" of the alleged "agreement" to restructure Rosemont's loan so as to reduce Rosemont's monthly payments, for to establish such a claim, plaintiffs would first have to prove the existence of a binding contract which obligated Trustmark to reduce the payments. It is clear, however, that there never was such a contract. Instead, the parties engaged in a process of negotiating terms for the restructuring of the debt but never agreed on terms of an agreement.

Despite Robinson's assertions in his affidavit, and plaintiffs' unwavering insistence throughout their submissions on the pending motions that Trustmark agreed to reduce the monthly payments on the loans to $10,000,[7] it is clear from Robinson's deposi-

---

7. Plaintiffs' memorandum response to defendants' motions for summary judgment is premised in substantial part on their contention that Trustmark and Rosemont had an agreement for the reduction of Rosemont's monthly payments. Plaintiffs state:

"There is no dispute that Trustmark agreed to reduce the Rosemont loan payments and that their agreement to do so was not conditioned upon a conversion provision." p. 7;

"To agree upon terms certain and later engage in a course of conduct contrary to agreement constitutes negligence." p. 10;

"Rather than simply honoring its agreement to reduce Rosemont's loan payment, Trustmark changed the course of its dealings by imposing the conversion provision desired by Gulf." p. 12;

"The plaintiffs dispute that Rosemont and Robinson defaulted on their obligations under the notes. Rather, Trustmark and Rosemont agreed on terms for reduction in loan payments which resolved and restored Rosemont's ability to perform under the terms of its loans." p. 14;

"Rosemont asked and Trustmark agreed to reduce the loan payments. This agreement was not a restructuring of the loan. Simply, the monthly payment was to be reduced." p. 15;

tion testimony and other proof that Robinson/Rosemont and Trustmark never, in fact, reached agreement as to the specific terms or conditions for reducing Rosemont's payments, i.e., for restructuring the loans.[8] When deposed, Robinson testified that when he went to the bank in the first place to discuss possible restructuring of the loan, he merely requested a reduction without suggesting a specific monthly payment; and although the Bank eventually indicated to him that it would be willing to reduce the monthly payments to $10,000, it offered to do so only for nine months, rather than for the life of the loan, as desired by Robinson. The documentary evidence provided by the parties confirms Robinson's deposition testimony. This evidence reflects that in early August 2001, Trustmark's counsel, William Little, forwarded to Eileen Shaffer, Robinson's attorney, a draft Loan Modification and Forbearance Agreement and Stock Pledge and Security Agreement for her comment and review. The agreement provided for a reduction of the monthly payment to $10,000 until the May 10, 2002 installment, at which time the installments would resume to be $18,568.97. Robinson explained in his deposition that this was not a viable or acceptable solution from his perspective, since Rosemont still would not be able to make the payments of $18,568.97 in May 2002. What he had envisioned and desired was a reduction in the monthly payment for the life of the loan, and the proposal by Trustmark did not afford the relief that was needed. Moreover, Robinson objected to certain language in the draft agreement which he interpreted as waiving his right to go to court to seek redress and thus he was not amenable to the terms that Trustmark proposed for reducing the payment.[9] The evidence, then, plainly does not support Robinson's assertion that "Rosemont and

> "[Rosemont] had already resolved its problems by securing agreement from Trustmark to reduce the loan payments." p. 15;
>
> "Rosemont's agreement with Trustmark to reduce payments was not a restructuring agreement and never involved Gulf." p. 15;
>
> "There was no 'failure of workout negotiations'. Trustmark agreed with Rosemont to reduce the loan payments." p. 15;
>
> "The fact that Rosemont and Trustmark agreed on a payment reduction plan is an undisputed fact." p. 16;
>
> "Trustmark had a duty to honor and perform its agreement to reduce the loan payments." p. 17;
>
> "Trustmark and Rosemont agreed to a payment reduction plan, the terms of which Trustmark reduced to writing." p. 17.
>
> These are but examples of their allegations in this regard.

8. The court notes plaintiffs' assertions in their response and response memorandum that there was no need to "restructure" the loan, and that they were not in default on the loan, since Trustmark had agreed to "reduce" the payments on the loan. Whether called "restructuring" or "renegotiation of terms" or "reduction of payments," there is no question but that Rosemont and Robinson sought modification of the original loan terms and that

their denial that they sought "restructuring" is mere quibbling over semantics. The complaint, in fact, specifically alleges that Robinson approached Trustmark about "restructuring" the loan, and Robinson freely admitted in his deposition that restructuring of the debt so as to effect a reduction in the monthly payments on the loan was the only way Rosemont could have continued to function.

Moreover, while plaintiffs may not have been in default when Robinson first approached Trustmark, it is undisputed that they were unable to make the loan payments; Rosemont was not generating sufficient income to cover the note and Robinson, who had been contributing substantial funds of his own toward payment of the note, had run out of personal funds with which to continue the payments. It is also undisputed that throughout the months of negotiations, no payments—not even reduced payments—were made.

9. Robinson testified that after he first went to the bank to request relief, some period of time passed before he heard from the Trustmark, and while at that time, the bank said it would accept his deal for $10,000.00 a month, that is not now it turned out. In Robinson's words:

Trustmark agreed on a payment reduction plan."[10]

From this evidence, it is clear that while Trustmark did at one time express a willingness to reduce Rosemont's payments for a limited period of time, nine months, following which the required payments would resume in the originally agreed-upon amount, this proposal was unacceptable to Robinson. There having been no agreement by Trustmark at any time to unconditionally reduce Rosemont's monthly payments permanently,[11] Trustmark could not have breached any duty of good faith and fair dealing implied in such an agreement.

■ The fact that the parties never came to terms on an agreement to restructure the loans also dooms plaintiffs' charge that Trustmark breached its duty of good faith in performing and enforcing the notes, for the factual basis for this putative claim is also grounded on Trustmark's alleged "agreement" to reduce the loan payments. To the point, plaintiffs submit that Trustmark failed to deal fairly and in good faith with Rosemont and Robinson by agreeing to reduce the loan payments and subsequently refusing to do so except on the condition that Rosemont convert common stock to Gulf Holdings in exchange for deferred interest payments. Since there was never an "agreement" by Trustmark to reduce the loan payments for the life of the loan, Trustmark could not have breached its duty of good faith by reneging on this agreement.[12]

[They] said they were going to offer it for $10,000.00 for 9 months but like I said, 7 months had already gone by.... and what the contract did, it gave me the deal but it took away all of my civil rights or all of my legal rights away from me. It stripped me of my legal rights. And I wouldn't sign it. I couldn't sign something like that.

He went on to say that while the amount was agreeable, $10,000 a month, the "length of time was not." Robinson testified, "I had to have more time."

10. Defendants have moved to strike portions of Robinson's and Margaret Lauro's affidavits on the basis that they directly conflict with their deposition testimony and the documentary evidence in the record, and as to Lauro's affidavit, they also contend that much that is included therein is not based on personal knowledge. To the extent that Robinson's affidavit conflicts with his deposition testimony, the court has deferred to his deposition testimony and disregarded contrary statements in his affidavit. Regarding Lauro, the court agrees that her affidavit contains very little that appears to be based on personal knowledge and much of which conflicts with Robinson's deposition testimony, and thus concludes that the motion to strike is well taken. *See Doe v. Dallas Indep. School Dist.*, 220 F.3d 380, 385 (5th Cir.2000) (party will not be allowed to "manufacture genuine issues of material fact by submitting an affidavit that impeaches prior testimony").

11. Not only do the facts not support the conclusion that the parties actually agreed on terms, even had they agreed in principle, they never had a binding agreement to which the duty of good faith might have attached. *See Knight v. Sharif*, 875 F.2d 516, 524 (5th Cir. 1989) (an agreement which is the subject of extensive negotiations is unenforceable until a final, signed version has been executed); *Collums v. Union Planters Bank, N.A.*, 832 So.2d 572, 577 (Miss.App.2002) (to be binding, an agreement to extend payment must be supported by sufficient consideration, and any oral modification of a written contract must be supported by additional consideration").

12. In an analogous case involving a plaintiff's allegation that a lender breached its duty of good faith and fair dealing by reneging on an unenforceable oral agreement to restructure a loan, the court aptly observed as follows:

[P]laintiff's alleged conduct regarding leases is inextricably linked to plaintiff's alleged conduct in reneging on its oral agreement to restructure the loan. It is undisputed that the written credit agreement did not require plaintiff to restructure the loan. Nonetheless, defendants state that the loss of leases resulted from plaintiff's refusal to go forward with the restructuring after

■ Although plaintiffs premise their position on their assertion that there was an agreement in fact by Trustmark to reduce the monthly payments, even assuming that they were arguing more broadly that Trustmark violated its duty of good faith and fair dealing simply by its ultimate refusal to lower the loan payments unless Robinson and Rosemont agreed to the proposal for transferring Rosemont stock to Gulf Holdings in lieu of interest payments to Gulf Holdings on its participation interest, they still would have no actionable claim. Courts have consistently recognized that unless the loan agreements themselves require the lender to restructure a loan, a lender has no legal duty to negotiate a restructure and hence does not violate its duty of good faith and fair dealing by refusing to negotiate at all and to instead enforce the remedies available to it upon the borrower's default.

For example, in *Commercial National Bank of Beeville v. Batchelor*, 980 S.W.2d 750, 753 (Tex.App.1998), the court rejected the borrower's argument that the bank's dealings in its failure to renew, extend, and lower the payment amounts under the notes somehow violated the bank's obligation to enforce the notes in good faith, stating:

> There is nothing in the notes imposing a duty on the bank to renegotiate or renew them on more favorable terms to the debtor. That the bank refused to renegotiate or renew the notes could not be a breach of its duty to perform in

good faith. There is no dispute that [the borrower] was in default. The bank could look to whatever legal remedies it had, including a foreclosure sale and suit for the deficiency, if any.

Similarly, in *Badgett v. Security State Bank*, 116 Wash.2d 563, 807 P.2d 356, 360 (1991), the court rejected an argument that a bank's duty of good faith required it to consent to a restructuring of its debtor's loan so that the debtor could take advantage of a certain federal program that could have saved its business financially. The court stated:

> [T]he duty of good faith does not extend to obligate a party to accept a material change in the terms of its contract....
>
> By urging this court to find that the Bank had a good faith duty to affirmatively cooperate in their efforts to restructure the loan agreement, in effect the [debtors] ask us to expand the existing duty of good faith to create obligations on the parties in addition to those contained in the contract—a free-floating duty of good faith unattached to the underlying legal document. This we will not do. The duty to cooperate exists only in relation to performance of a specific contract term. As a matter of law, there cannot be a breach of the duty of good faith when a party simply stands on its rights to require performance of a contract according to its terms.

Countless other cases have recognized this same fundamental principle. *See, e.g.,*

plaintiff orally promised not to backtrack from a proposed restructuring plan. Because defendants' own description of the alleged breach of a duty of good faith and fair dealing shows that it is really based on the purported oral credit agreement to restructure the loans, we conclude that defendants are attempting to bootstrap the alleged breach of a duty of good faith and fair dealing stemming from the written credit agreement into an alleged breach of a duty

of good faith and fair dealing arising from the purported oral credit agreement. We decline to extend the implied duty of good faith and fair dealing to the extent urged by defendants. Accordingly, defendants' argument that plaintiff breached a duty of good faith and fair dealing fails.

*Teachers Ins. & Annuity Ass'n of America v. LaSalle Nat. Bank*, 295 Ill.App.3d 61, 73, 229 Ill.Dec. 408, 691 N.E.2d 881, 890–91 (Ill.App. 1998).

*Bank of America N.T. & S.A. v. McMahon*, 8 F.3d 25, 1993 WL 366663, *3 (9th Cir.1993) (holding that "the covenant of good faith and fair dealing is not breached when a lender takes a 'hard line' in loan repayment negotiations" since "[c]ontracts are enforceable at law according to their terms"); *Glenfed Financial Corp., Commercial Finance Div. v. Penick Corp.*, 276 N.J.Super. 163, 176, 647 A.2d 852, 858 (N.J.Super.A.D.1994) (lender's refusal to exercise greater forbearance "would not constitute a lack of good faith because the loan agreement imposed no obligation upon [the lender] to grant a waiver of [borrower's] defaults under any circumstances. A creditor's duty to act in good faith does not extend to foregoing its right to accelerate upon default or otherwise compromising its contractual rights in order to aid its debtor.").

A number of courts have implicitly recognized, in fact, that a duty of good faith and fair dealing does not arise even where a lender begins negotiations towards restructuring an existing loan. *See, e.g., Carter's Court Assocs. v. Metropolitan Fed. Sav. and Loan Ass'n*, 844 F.Supp. 1205, 1210 (M.D.Tenn.1994) (holding that lender was not under a duty to restructure the loan under the express terms of the loan documents or under any implied terms; that "[i]n the absence of an express contract term, there is no duty on the part of a lender to negotiate a workout or provide increased credit;" that "there is no breach of good faith for a party to act consistently with the terms of a written agreement;" and that therefore, even after it began negotiating, lender had no duty of good faith and fair dealing); *cf. Teachers Ins. & Annuity Ass'n of America v. La-*

*Salle Nat. Bank*, 295 Ill.App.3d 61, 691 N.E.2d 881, 229 Ill.Dec. 408 (Ill.App. 1998)(where original loan agreement did not require lender to restructure loan, lender's alleged wrongful refusal to approve borrower's proposed leases of the property which secured loan was not breach of implied duty of good faith and fair dealing where lender's alleged acts occurred during loan restructuring negotiations which were oral and did not give rise to enforceable agreement).

In this case, plaintiffs do not contend that the original loan agreements imposed any obligation on Trustmark to restructure the loan. Thus, from the foregoing, it is apparent that Trustmark was under no obligation to agree to a reduction in payments or to restructure the loans in any way; and it follows that plaintiffs have no claim for breach of the duty of good faith and fair dealing simply because the lender was willing to consider restructuring plaintiffs' loans on terms that plaintiffs considered wholly inappropriate and unacceptable.[13] And, once plaintiffs stopped making payments on their obligations, the bank was free to foreclose on the security without violating any duty of good faith and fair dealing.

*Interference with Contract and/or Business Relations*

■ Plaintiffs allege that Gulf Coast and Gulf Holdings "tortiously interfered with the business and banking relations of the Plaintiffs." Defendants point out that unlike the tort of "interference with business relations," the Mississippi Supreme Court has not recognized a tort of "interference with banking relations." They fur-

---

**13.** The court would note that whereas plaintiffs posit that the proposal was part of a conspiracy between Trustmark and Gulf Holdings for the purpose of Gulf Holdings' gaining control of Rosemont without paying fair value for the business, plaintiffs' position fails to account for that provision of the proposed Loan Modification Agreement for Rosemont's retention of the right to repurchase its stock from Gulf Holdings at any time upon payment to Gulf Holdings of the deferred interest.

ther argue that the facts of this case do not fit within the parameters of the "interference with business relations" tort, and that plaintiffs cannot establish tortious interference with contract relations.

Defendants note that interference with business relations typically involves the diversion of customers away from the plaintiffs' business, thereby encouraging customers to trade with another. They submit that is not what is involved in the case at bar. Indeed, as plaintiffs implicitly recognize in their response brief, their claim is actually for tortious interference with contractual relations and is premised on their argument that

Gulf, as a majority participant in the loan, by insisting that a conversion provision be a condition of Trustmark's extension of credit to Rosemont, with the accompanying motive to gain control of Rosemont, committed an unlawful act under the law of the State of Mississippi [which] resulted in substantial harm to Rosemont.

Plaintiffs contend that as a result of Gulf's improper influence over Trustmark as to its course of action, Trustmark, "rather than simply honoring its agreement to reduce Rosemont's loan payment, . . . changed the course of its dealings by imposing the conversion provision desired by Gulf."

■ While this claim is problematic for a number of reasons, one stands out as being most obvious: Plaintiffs have not proved that Gulf caused Trustmark to breach any contract with plaintiffs.[14] Trustmark did not breach the lending agreement, which was the only contract it

had with plaintiffs. As the court has concluded *supra*, there never was an enforceable agreement by Trustmark to reduce Rosemont's loan payment so there could be no breach of any such agreement. The gravamen of a claim for tortuous interference with contract is proof that a defendant caused the breach of a contract between the plaintiffs and a third party, *see Cenac v. Murry*, 609 So.2d 1257 (Miss. 1992), and that did not occur here.

*Negligence, Negligent Misrepresentation and Fraudulent Misrepresentation:*

■ Plaintiffs allege in the complaint, without explication, that Trustmark was "negligent in the banking relationship." They charge further that defendants made negligent misrepresentations and fraudulent misrepresentations, though they fail to identify specifically what they contend was misrepresented. Plaintiffs' response brief is somewhat more illuminating, stating as follows:

Trustmark was negligent in conduct concerning Rosemont's loan payments. Trustmark made material misrepresentations pertaining to the loan payment reduction. To agree upon terms certain and later engage in a course of conduct contrary to agreement constitutes negligence.

Gulf was negligent in its dealings with Rosemont. Gulf expressly represented to all parties its intent to infuse capital in Rosemont, thereby converting debt to equity. . . . Gulf's conduct amounts to misrepresentation which caused great harm to Rosemont.

---

**14.** See *King's Daughters and Sons Circle No. Two of Greenville v. Delta*, 856 So.2d 600 (Miss.App.2003) ("[T]o prove tortious interference with a contract, a plaintiff must normally show these elements: (1) the acts were intentional and willful; (2) that they were calculated to cause damages to the plaintiffs in their lawful business; (3) that they were done with the unlawful purpose of causing damage and loss, without right or justifiable cause on the part of the defendant (which constitutes malice); and (4) that actual damage and loss resulted.'').

To establish a claim of negligent misrepresentation, plaintiffs must prove there was a misrepresentation as to a past or existing fact. A promise of future conduct will not support recovery under the theory of negligent misrepresentation "unless the promise was made with the present intent not to perform." *Bank of Shaw v. Posey*, 573 So.2d 1355, 1360 (Miss.1990) holding that failure to extend a promised loan was not a misrepresentation. Plaintiffs must also show detrimental reliance. *See id.*

As regards Trustmark in this case, the court has already concluded that the record facts do not support plaintiffs' allegation that Trustmark had "agree[d] upon terms certain" for restructuring the loan. There was never anything more than proposals which Robinson/Rosemont found unacceptable, and hence, there never was any "representation" by Trustmark that it would accept reduced loan payments.

As for Gulf Holdings, in the court's opinion, the proof does not support plaintiffs' allegation that Gulf ever misrepresented that it would infuse capital into equity; but even if it did, there is no evidence that Robinson/Rosemont relied on any such representation to their detriment. Accordingly, plaintiffs' claims fail as a matter of law.

For all of the foregoing reasons, the court is of the opinion that defendants' motion for summary judgment should be granted on plaintiffs' claims against it. For the same reasons, the court concludes that defendants are entitled to summary judgment on their counter-claim against Robinson to establish his liability on the notes in the total amount of $2,878,523.24, together with interest from October 15, 2003. Plaintiffs' opposition to the motion for summary judgment in the counter-claim, like their response to the motion for summary judgment on their own claims, is based on the existence of an alleged agreement by Trustmark to accept reduced payments on the notes. That is, they claim there never was a default in view of Trustmark's agreement to lower their payments. Clearly, however, that is not the case. *See supra* note 7. And, as it is undisputed that Robinson is a co-maker on the notes, he is liable for the full amounts due thereunder.

## Conclusion

Based on the foregoing, it is ordered that defendants' motion for summary judgment is granted, as is their motion for summary judgment on the counter-claim.